# ALTMAYER v. TRAVELERS PROTECTIVE ASS'N OF AMERICA.

## No. 7467.

Circuit Court of Appeals, Seventh Circuit

May 22, 1941.

J. Elmer Lehr, of Milwaukee, Wis., for appellant.

John D. Kehoe, and Alex Wilmer, both of Green Bay, Wis., for appellee.

Before SPARKS and MAJOR, Circuit Judges, and BRIGGLE, District Judge.

BRIGGLE, District Judge.

Plaintiff as beneficiary under a certificate of insurance issued to her deceased husband, Will S. Altmayer, recovered a judgment in the District Court. Defendant appeals, asserting error, among other things, in the denial of its motion for a directed verdict.

The defendant is a fraternal benefit society, incorporated under the laws of the State of Missouri, and on July 5, 1932, issued to Will S. Altmayer its certificate of membership which provided, that whenever a member in good standing shall independently of all other causes, through external, violent and accidental means receive bodily injuries which shall solely and exclusively cause death such member's beneficiary shall be entitled to the sum of $5,000. The insured died May 17, 1939, at the age of 59 years, from a sub-dural hemorrhage with a contributory bronchial pneumonia. The medical testimony defines a sub-dural hemorrhage to be a hemorrhage between the dura, which is the outer covering of the brain, and the skull.

Plaintiff asserts that insured received an accidental injury on April 20, 1939, which resulted in the condition producing death. There was but one person besides insured present at the alleged occurrence on April 20, and the facts to support the assertion of an accidental injury on that occasion are to be taken entirely from the testimony of one John Charles, with all reasonable inferences and presumptions to be derived therefrom. They are, as follows: Insured was engaged in the business of buying and shipping straw and hay and the witness John Charles was, at the time, engaged in hauling baled straw by truck and loading the same in a box car under the supervision and with the assistance of the insured. The bales were approximately 38 to 40 inches long, 22 inches wide and 18 inches thick, and weighed on the average 125 pounds each. Charles had on April 19 partially loaded the car with baled straw, a few bales of which were wet and had been placed loosely in one end of the car, while the dry straw was stacked in tiers at the other end. On April 20, Charles brought another truckload of baled straw to be loaded in the same car and met the insured at the scales a few blocks away. After the straw was weighed, the insured went in his own automobile to the car in question where Charles soon arrived with his truck. When Charles arrived at the car, the doors were open and insured was standing in the car. Charles proceeded to unload the truck and there were 7 or 8 wet bales in this load. The dry straw was

packed by Charles in one end of the freight car, as on the previous day, and the insured received and disposed of the wet bales in the opposite end of the car. Charles used a hook in handling the bales of straw, but the insured had no such hook and proceeded to roll the wet bales with his hands to the opposite end of the car. The previous day, Charles had placed 15 to 20 wet bales of straw on edge, leaving an air space between them, not in any regular uniformity. As thus placed, the bales extended in height about 22 inches from the floor of the car. On the 20th the wet bales were being similarly handled, with some of them being placed on top of those of the previous day, making a tier two bales or 44 inches high. Charles' attention was attracted by insured calling: "Hey! Would you please give me a hand?" Charles turned and saw the insured standing on the floor of the car in the air space between two tiers of bales each about 44 inches high and with his arms resting on top of one of the bales. The tiers of bales extended about to the armpits of the insured who was approximately five feet, nine inches tall. Charles theretofore had paid no particular attention to insured and had only observed that insured was tipping a bale of straw toward himself as he moved backward to the end of the car where the wet bales were being piled. Charles walked to the insured and gave him a hand and the insured then sat down on the bale that he had been engaged in rolling into position. Insured did not further help in the work of loading the car. From all that Charles could observe the insured was in his usual good health before and at the time they started to work, but after he sat down on the bale he said nothing and sat in the same position for 40 to 45 minutes, while Charles finished the job. He was somewhat in the way of Charles, but Charles did not request him to move. His hands were shaking as he sat on the bale. When the truck was unloaded, insured left the car cautiously and Charles noticed that he was shaking. Insured went to his automobile and drove it away and Charles did not again see him. On the basis of the foregoing, buttressed by the subsequent medical testimony, plaintiff urges that insured suffered a fall on the occasion in question.

Insured had to all general appearances been in normally good health prior to this day and had suffered no injury that his wife or family knew of. Following the day in question, his acquaintances noticed that he seemed to be in a melancholy state, contrary to his usual disposition; that he did not seem to understand a game of cards that he had previously enjoyed; that he failed to talk much and did not seem to understand; that he paid little attention to his granddaughter of whom he was very fond; that he had difficulty rising from chairs and going up stairs; that he rubbed his arm and the back of his head; that he did not read his paper and did not listen to his accustomed radio programs; he spilled his coffee and mixed fruit juices with his coffee; he went to get his paper and came back without it; all contrary to his usual demeanor prior to April 20. He returned a few days later and billed out the car of straw, but other than this did no further business.

He had no medical attendance until May 1, when he was taken to a physician who said he seemed hazy and unable to give a clear history of what previously had happened. He did, however, state that he had fallen, and he had several small bruises about the size of a quarter or half dollar in the lumbar region of the back and similar bruises in the region of the right chest. He complained of a back injury and stiffness and pain in the back of the neck, but other than the foregoing the doctor could discover no signs of external injury. The doctor diagnosed his condition at that time as a back injury, probably torn ligaments in the lumbar region. His doctor again saw him on May 5, and found that he had a spastic paralysis of the right arm and facial muscles and that he was in a semicomatose condition. He then diagnosed his condition as cerebral hemorrhage. Insured, thereafter, became progressively worse and was taken to the hospital on May 13 and died on May 17. The doctor gave the cause of death as cerebral hemmorrhage with contributing bronchial pneumonia, but after an autopsy held that same night concluded that the cause of death was subdural hemorrhage rather than cerebral hemorrhage, which conditions are closely related.

■ The medical testimony at the trial was conflicting, some of the doctors holding that in a very large percentage of cases sub-dural hemorrhages are the result of trauma; the medical learning upon the subject is, likewise, at variance, many support the view that trauma is usually the contributing factor in such hemorrhages;

others believe that such hemorrhages may be the result of either a traumatic condition or a diseased condition of the patient and still others holding that trauma has nothing to do with it. For present purposes, plaintiff is entitled to the view most favorable to her position.

■ The question for decision by this court is whether under the circumstances above outlined there was a jury question. Plaintiff urges that while there was no direct testimony of any accident or any traumatic injury to the insured on the date relied upon, yet the circumstances there present, with the medical testimony justify the conclusion reached by the jury that insured's death was the result of accidental injury. On this point plaintiff relies largely upon the cases of Andrzejewski v. Northwestern Fuel Company, 158 Wis. 170, 148 N.W. 37, and Cronkhite v. Travelers' Insurance Company, 75 Wis. 116, 43 N.W. 731, 732, 17 Am.St.Rep. 184. We have carefully studied these cases, and the fact situation present in the Andrzejewski case was so wholly different from that here disclosed as to make it inapplicable. In the Cronkhite case it is true that the court held that had the plaintiff proved only that the insured at a certain time had upon his person bruises and wounds, evidencing that he had been recently injured by external violence and further that such injuries caused his death, she would have made out a prima facie case of death resulting from bodily injuries "through external, violent, and accidental means." It should be observed that in that case the court thought that the bruises and wounds referred to would make a prima facie case, as such bruises and wounds resulted in death. In the instant case, the only evidence of bruises was what the doctor found in the lumbar region and on the chest (apparently deemed inconsequential by him), about 11 days after April 20, and plaintiff does not contend that they in any way resulted in insured's death. Plaintiff only contends that they are evidence of his having received violent and accidental injuries that might have contributed to the hemorrhage, resulting in death. While it is true that plaintiff is entitled to any proper inference to be drawn from evidentiary facts, it is not legally correct to base one legal inference upon another or one presumption upon another. Esser & Co. v. Industrial Commission, 191 Wis. 473, 211 N.W. 150; Brown v. Maryland Casualty Co., 8 Cir.,

55 F.2d 159. Moreover, in the instant case, the time intervening between the alleged injury and the discovery of the bruises was a factor not present in the Cronkhite case. Under the circumstances here shown, this authority is not persuasive.

While counsel for plaintiff have repeatedly, both in the examination of witnesses before the jury and in their briefs, referred to insured being found down in a "hole" and having "fallen in a hole" and the witness Charles having "pulled him out," there is utterly no basis in the evidence for such characterization and no basis for assuming, either that he fell in a hole or that Charles pulled him out. Charles says, "I walked to him and give him a hand. Then he sat down on the bale he was, you know, rolling into that opposite end." Later, on cross-examination, "He was standing on the floor of the car * * * in between two layers of bales when I helped him out." Insured said nothing except the words already quoted. He made no exclamation or cry indicating a sudden fall or injury. The witness Charles was a young man who said his hearing was good and he heard nothing indicating a fall or sudden movement. Little noise would be occasioned by the handling of bales of straw and it seems completely reasonable that if insured had suffered any violent injury, by falling or otherwise, the witness would have observed it either through the sense of sight or hearing. A careful study of the testimony of Mr. Charles, the only witness present on the occasion relied upon, convinces us that the facts and circumstances shown by his evidence are consistent with a theory that insured's condition, which appears to have developed from that time forward was caused by bodily infirmity and inconsistent with any theory of accidental injury. To conclude that he suffered a violent injury on April 20 is pure speculation and without substantial support in the evidence.

■ Some of the medical experts were erroneously allowed to testify that in their opinion the sub-dural hemorrhage suffered by insured was caused by the fall in the box car. This was not a matter for expert testimony had there been any evidence of a fall in the box car. It clearly invaded the province of the jury. While it is true that either the insured or members of his family in giving the history to the attending physician said that he had suffered a fall, and while that may have had its

proper place in the case for some purposes, such statement of insured to his physician cannot, under any circumstances, be accepted as competent proof of a fall in the box car. This obviously would be a violation of the hearsay rule. While there is no evidence of malingering in this case, such a suggestion abstractly made makes clear the wholesomeness of the rule.

The burden of proof was, of course, upon the plaintiff to show that the insured's death was caused by external, violent and accidental means not merely that it might possibly have been so caused. With due regard to the accepted rule that if any substantial evidence, with all reasonable inferences that fair minded men might draw therefrom, supports the finding of the jury it should not be disturbed, we are impelled unalterably to the conclusion that under the competent evidence here presented there was no jury question.

Defendant also urges, as an additional ground to defeat recovery that plaintiff's beneficiary caused an autopsy to be performed upon the body of the insured without notice to it, in violation of a provision of defendant's constitution. The certificate provided that the constitution and by-laws of the defendant association were to be a part of the insurance contract and Section 4, Article 12 of such constitution provided that "in case of autopsy this association shall have five days notice thereof and an opportunity for its medical adviser or surgeon to be present and participate therein, and a failure to give such notice and permit such participation shall invalidate and forfeit any and all claims under the certificate of membership." Plaintiff concedes the validity of this provision of the insurance contract, but asserts estoppel on the part of the defendant to invoke the same by reason of a paragraph printed upon the certificate in red ink which purports to inform the insured or his beneficiary of the things to be done in the way of giving notice to defendant in case of an accident. This paragraph is silent in reference to the provision concerning autopsy. Plaintiff asserts that defendant when it undertook, voluntarily, to advise its members, assumed the duty of making its advice full, fair and complete. This point is elaborately covered in the briefs and upon oral argument, but in view of our conclusion that plaintiff has not otherwise made a case it is unnecessary to consider the same. The judgment of the District Court is reversed.

Reversed.